So, good morning, Your Honor, and may it please the Court, Danielle Leonard from Altshuler-Groszon for the appellants, and may I please reserve three minutes for rebuttal? Yes. Well, maybe. I mean, aspirationally, yes. Thank you. Thank you, Your Honor. Plaintiff Lisa Kim and Defendant Tinder together agreed to release the claims of 240,000 California consumers against whom Tinder had engaged in age discrimination in exchange for nothing of monetary value to the vast majority of the class and little of real value to the rest. Approval of this deal must be reversed for three sets of reasons, each of which is dispositive and which I intend to address in turn. First, the district court's approval opinion is riddled with legal and factual errors, fails to apply the exacting scrutiny of pre-certification settlements, pre-class certification class settlements that this court has long demanded, in particular with respect to the inflated $24 million value that the court endorsed, which is not supported by the record, which reflects errors of law, and in fact, when the monetary value of this deal to the class on this record is $44,000, not $24 million. Second, even if the court had applied proper scrutiny, this deal cannot be approved consistent with Rule 23E, it is fatally flawed because it gives nothing of value to so many class members for giving up what are valuable state law claims, and because there's a structural problem in which they've given the in-kind relief to the current customers of Tinder at the expense of the former's. There's a structural flaw in this deal that is incurable. There's a second incurable problem, which is the third reason for reversal, which is Plaintiff Kim is an inadequate class representative. Due process and this court's precedent, indeed the Supreme Court's precedent, Hess, Hanlon, and the Supreme Court, and Amchem, on which Hanlon and Hess are based, require that a plaintiff be able to vigorously prosecute class claims in order to negotiate a settlement that releases those class claims. Here, Plaintiff Kim couldn't prosecute the class claims at all at the time she entered into this deal, let alone vigorously prosecute them, and that she reached out and included claims that she could not prosecute, and that is fatal, it's incurable, and for both of those reasons, two and three, this is not a do-over case. If we were just dealing with the first set of problems, a court that applied not the exacting scrutiny, which many class certification approval decisions that are appealed to this court have that problem, the court would do what it does, which is remand for application of proper scrutiny. That would be futile here, and a waste of the district court's time because there are fatal and incurable laws. Because Rule 23E, approval of this deal is not consistent with Rule 23E, and because Plaintiff Kim is an inadequate class representative. This case, everyone here agrees this case should be over. It should be over with approval of this deal denied. Plaintiff Kim should be free to pursue her individual claim through the arbitration proceeding that she has yet to begin. She's entitled to $4,000 in statutory damages for every month that she paid Tinder the discriminatory pricing. She can pursue that through her individual claim. And the class claims, the class claims that Plaintiff Kim and Tinder are attempting to release here, they should go back to state court where there is a plaintiff who has been vigorously prosecuting those claims for years and will continue to vigorously prosecute those claims in the interest of the class. The stay of the claims will be, the stay of that case will be lifted upon the decision of this court. The plaintiff will continue to vigorously prosecute those claims, unlike the manner in which Plaintiff Kim and her counsel have prosecuted or failed to prosecute those claims. And you claimed that basically the court didn't apply the right standards and didn't, but at the preliminary approval stage, the district court determined that the settlement would likely receive the court's final approval based on enumerated fairness factors, which is all that rule 23E1 requires. At the final approval stage, the district court invoked and applied rule 23E2 and the long accepted factors articulated in Churchill Village versus General Electric, which is enumerated in 23E2 factors do not displace. So I'm not really seeing, yeah, I see that you see it differently, but it seemed to me that the district court used the proper framework. So I don't, I guess I'm not, you know, I'm not seeing what you're saying there as far as. Thank you, Your Honor. So quoting the standard is not the same thing as applying. And this court has never stopped at whether the court below quoted the proper standard. The court has always looked at to see whether the court applied the proper standard. And with respect to preliminary approval, the court also said something else in addition to citing the proper part of the rule, which is that it was only going to apply a cursory review, which is the old standard that some courts applied. So that's incorrect. But more importantly, on final approval, the court did not apply the comprehensive review that this court demands, because when you look at how it endorsed the valuation, if you look at the analysis and the opinion, you can see that it didn't apply exacting scrutiny. $24 million, $24 million in monetary value is not supported by this record. The court assumed 100% claims rate. The court analyzed the claims, the monetary component, using 100% claims rate proposed value. That is inconsistent with this court's standards. The Vargas case, which Judge Rakoff participated in, the Vargas case says you cannot assume 100% claims rate to value a proposed settlement consistent with the comprehensive review that this court demands. In a consumer class action, the assumption of 100% claims rate, so the $6 million for that component is 240,000 class members times $25. That's 100% claims rate. That is not a reasonable assumption. Even plaintiff's counsel understood that that's not, and Tinder's counsel, because it's in plaintiff's counsel's brief when they tell the court that they expected a one to 3% claims rate in a consumer class action, that the one to 3% claims rate they now contend is what happened here is well within the expectations. 100% claims rate is reversible error. Let me take you to the attorney's piece. I want to ask, I got some questions to ask about that. Because if you lose on the first part and say we were to affirm, I'm saying this hypothetically, that we said the settlement was okay. The 1.2 out of the settlement numbers isn't, it doesn't violate any of the number things that are out there. But it seemed to me that the district court analyzed this under alternate theories. And one of them was the lodestar on the attorney's piece. Do you challenge that I'm not, if let's just say I think that under the alternate theory, the district court wasn't correct, but under the lodestar, this can be supported. Wouldn't it be an affirmance then? I mean, if one theory is satisfied? I think the standard in this court should be that if it's not so. Not gonna be, I don't want to hear what I should be doing. So I want to hear what the law says I have to do. And what I'm saying, there were alternate theories of attorney's fees and the lodestar to me seems that wasn't really seriously objected to by either side here. If I believe that that would be supported, why can't I affirm on that theory? So we did object to the lodestar below. We didn't focus on the attorney's fees. Admittedly, the portion of our brief to this court didn't focus as much on the attorney's fees because the far greater problem is approval of the settlement in the first place. But to answer your Chair Oner's question, I do think it would be inappropriate under either the common fund or the common fund here does not support the attorney's fees for sure. But I think it would be inappropriate based on the reasons that we articulated to the district court that the lodestar method doesn't support it either. But the far greater problem, the far greater problem is the comparison of monetary value in this deal, $44,000 to the 1.2 million that plaintiff's counsel seeks or indeed sought to achieve through this settlement. This court's standard, if the court recognizes that the common fund does not support the 1.2, I do think it would be a problem given the monetary value to approve the settlement under Bluetooth. I think that would be a problem, Your Honor, if that follows. If you're saying that the common fund doesn't support the fees and you want to grant them under lodestar and asking whether that would be okay, if the common fund doesn't support the fees, there's a bigger problem. The problem is that the settlement comparison to the fees is fundamentally flawed. And that is a problem for approving the settlement. But legally, okay, legally though, it would seem to me, you won't like this, but legally, it would seem that we could affirm the settlement and then, and that still, then the attorney's fees is a separate issue than if we get past the settlement. It's not, one doesn't, if we approve the settlement, it doesn't necessarily follow that then, you know, you're saying, well, then all the arguments I made on the first one then should make the, you know, technically, your honor, they are separate issues, but there is an interaction because of the way that the rule 23 requires a comparison between the monetary value to the class as compared to the fees. It's a package deal and always has been in terms of approval. And if the court, what the court, I understood your honor's question to be, if I had to assume that the common fund didn't support the fee claim. And if that is true, there is a problem with approval because the monetary value as compared to the fees is problematic. That is true. You're saying that if counsel spent in terms of Lodestar, a million dollars worth of time, and all they can show for it is $44,000 in return for their class of numerous, numerous victims, something's wrong with that settlement. I'm saying more than that. It was approximately 300 and something Lodestar or 400 Lodestar. They got a significant multiplier here, your honor. That's true too. So the 1.2 as compared to 44,000 in monetary value to the class is a hugely problematic comparison for a class settlement, particularly where so many class members are going to get nothing. They're releasing valuable claims. And in order to approve this, to affirm the district court's approval of this settlement, you'd have to affirm the $24 million valuation that the court approved. And it is not supported by the record. It is based on legal error. And that cannot be approved. I wanna say, oh yeah, go ahead, Judge Walker. Just wanted to ask one question because I certainly agree with you that certain components of the 24 million were overvalued by the district court. But let me ask you this. It seems to me, you keep stressing how the absent class members are being forced to release valuable claims. And you say that, I guess each of them would be entitled to at least $4,000 in statutory damages. And obviously if you're right about that, this settlement could not be approved. I completely agree with you on that. It seems to me though, that the district court started from a different position, basically viewing these as worthless claims because I think the court maybe found more persuasive that other court of appeal decision rather than the one that you all have won. And I guess I just wanted to hear your response to that. Because I will confess to you that I'm more in line with the district court. This just seems like a weird, this doesn't seem like invidious discrimination. It seems like they're trying to cut a break to these poor deserving young folks who don't have as much money. And what's wrong with that? How can you, why are you taking away this discount from these poor people, right? But so speak to that, because that I think inform the district court's analysis. The district court started out from the position that this just is kind of a joke of a lawsuit. Are you kidding me? So obviously if they give anything for these claims, this is okay. And your view is that, there's damn near a billion dollars in statutory damages. And so maybe you can speak to that. Sure, thank you, your honor. And I agree with you. That is exactly an accurate description of the courts, the district court's analysis that these were worthless claims. And it is an error of law for the court to have concluded that. And let me explain why. So this is not a circumstance where the district court was free to choose between competing Court of Appeal decisions and the California Court of Appeal decisions and say, I like divorce be better. The Candelari Court of Appeal decision is law of the case with respect to the class members' claims. The class members' claims that are being released include the claims in the state court litigation. It's exactly the same as the Kobe case, which Judge Wofford, you were a part of. The Kobe case where the Florida court claims that were being released, the court looked at the value in that litigation of those claims to assess the value of the claims that were being released. That's what the court should have done here. It should have looked at the state court Candelari claims, the class members' claims there, which are encompassed in the release and should have said there are valuable claims being released in that case. And those courts are bound by the Candelari Court of Appeal decision. I guess I look at them though, if I see two conflicting things that, still in this federal case, they're going to have to, you have to assess, are you likely to succeed on any of these and the fact that different courts, that it's coming out different ways. And compared to some things that we see, this isn't the most invidious discrimination. I'm not saying that it's right or wrong, but people can look at it differently and don't, if you've got a risk of losing and you've got some, the bird in the hand or whatever, all of those things, because this went to, it seems like they had to prepare the complaint. They had to oppose the motion to compel arbitration. What? And they appealed that compelling arbitration and they had two additional rounds on class notices, right? So there was some stuff that went on here. Very little, Your Honor. There's nothing with respect to the class claims. What do you think if they go to trial and get zero? I mean, all of those things, other cases don't, they can give you an idea about how different people see things, but neither of those are really law of the case for us, right? They are law of the case for the class members' claims, Your Honor. That's what's different about this case because there was a pending state court claims that are being released that are bound by the Candelari decision. The court was not free to disregard that decision and the impact on the value of the class claims. That is not true, Your Honor. That is an error of law for the court to do that because the class member claims that are being released in this case include the state court claims. And the court was not, the court could not just look at the box of plaintiff came in the claims that she was releasing in this case because you have to look at the other pending litigation as well. That's what the court did in Covey. The commentary to Rule 23- Hey, you're over your time. You're over your time. Let me just see if my colleagues have any additional questions. You know, I'll still give you two minutes for rebuttal, but you're already over two minutes over besides, so. Thank you, Your Honor. All right. So then we're going to go to Mr. I had you go, Mr. Bacon, you're going next. Is that correct? Thank you, Your Honor. Okay, we have the clock at eight minutes there. Okay. And you don't get rebuttal. I was, sorry. Too bad. Thank you, Your Honors. And may it please the court. There's a fine balance between valid and invalid objections in a class action settlement. And ultimately adjudicating the validity of objections, as well as the fairness of a settlement to absent class members, falls under the discretion of the district court, which is why the standard for appellate review is abuse of description and not de novo. Regardless of whether Your Honors would have ruled differently as the objectors are requesting, that's not the standard. They want a second bite at the apple, but the Ninth Circuit has consistently declined to act as green eye shade accountants and second guess discretion when there are no novel issues of law. Other side of that coin is that the district judge has to exercise a rigorous analysis because the district judge really is the ultimate representative of making sure that the class members are not being sold out. And so, yes, we only reverse for abuse of discretion, but we have to be satisfied that there was a rigorous analysis here. Now, how, for example, did he get to the, did the district judge get to the $6 million for the injunctive? Certainly, and Judge Rakoff, I think that's a fair question. Now, with respect to the $6 million valuation, I think it would be fair for this court to find that that was an overvaluation. However, I will tell the court what the justification for that was from class counsel's perspective. And what that is, it's based on the anticipated monetary value that's provided to the class via the cessation of the allegedly unlawful discrimination practice going forward, which would benefit every single member of the class because anybody who used the Tinder app in the future, which is the majority of class members, would no longer be subject to that discrimination. And what we did as class counsel is we balanced the valuation of the injunction against the valuation of the other components of the settlement, namely the universal participation component and the monetary relief component. And if we had done that in full, it would have valued the injunction at $18 million, but for conservative purposes, we represented the court that we represent, that we believed it was valued at $6 million. Now, let's assume for sake of argument, as objectors point out, let's assume that they're right and that that injunctive component, while it is not valueless, is ephemeral and difficult to value and that the $6 million valuation is a monetary amount that is not necessarily justified. That does not necessarily make the settlement unfair. It also doesn't render the injunction worthless as counsel for objectors is stating. In fact, it's the exact injunctive relief that would have been available to the class in which my client pled in the complaint. A settlement agreement with the class couldn't have forced Tinder to falsely advertise to non-class member customers by yanking away the discount that had already been advertised to them. All it could do was correct the behavior going forward for any future customers and put all customers on an even non-discriminatory playing field, which is exactly what the injunction did. That is a benefit under the UCL that was pled in the complaint and served as our basis for a public injunctive relief claim and it is absolutely untrue to say that that is a valueless claim because it was a claim that we were pursuing from the outset and it is a claim that's provided under the plain language of the unfair competition law. So I do think Your Honor is giving correct pushback in that the valuation of that component could potentially be subject to scrutiny by this court, but that alone does not render the entirety of the settlement unfair. In fact, the majority of the benefit to the class comes from the super-like benefits, which are automatic, universal, and were provided into every single class member's accounts automatically as a result of this settlement. Why isn't that, not perhaps as a matter of law, but just as a matter of practicality akin to a coupon settlement? Great question, Your Honor, and it's very different. I'll explain why. Let me give you a hypothetical. Let's say a retailer like Macy's gives a $10 off coupon or a 25% off coupon to a consumer in a settlement. That benefit cannot be consumed in its entirety by a consumer necessarily. It has to be associated with an individual purchase by that consumer. And so it's distinct. It's very distinct because super-likes are individual consumable products that we know based on discovery that was conducted by class counsel, which is in the record of the case, that were in fact being used by the majority of class members. In fact, the record shows that Tinder was making over $90 million in these a la carte purchases and that it comprised 12% of its annual revenue. Moreover, the class members were using them at a rate of 34 per month on average. And we know that from discovery and it is in the record. And so we know it's very- Counsel, was that figure for all class members? In other words, all folks who purchased one of those two, what you call them premium services, or was it just the average number for people who did in fact purchase additional super-likes? No, that's the average across all class members, Your Honor. And we also know from discovery though, I don't believe it is in the record that the majority of class members were purchasing them. So in other words, your opponent's position, as I understand it, is that they all get 150 of these things a month. And so you're saying that on average, every single class member used up not only the 150 they get for free essentially, but in addition, they bought 34 more? Correct, they were spending $34 a month on average on these in addition to their service based on the discovery. Every single class member? Well, it's an average. So certainly there's some class members who buy more. I thought the figure was actually a subset and it was only of those who did purchase additional super-likes of those people, on average, they bought 34. And that could be 1%, could be 2%, it could be 90%. But I thought the record was silent on what percentage of the larger group that subset consists of. I believe it's 34 on average per class member, but I'll let Mr. Brown speak to that more as I'm running out of time and I wanna get to a couple of other things. I think he can address that in more detail. Now with respect to, there were a couple of points that counsel raised. I wanna just distinguish very clearly this case from the Kobe case. That case was an atrocity. Your honor was correct in reversing it, the district court's decision. I think the problem with that case is that it was a pure B2 settlement that was disguised as a B3 settlement. It released monetary reliefs of members of the class while providing them only a worthless injunctive relief. Injunction here is stronger. In fact, the injunction here is more akin to another Ninth Circuit case that just came out a few months ago. That's called Little John versus Copeland, which involved false advertising. And that case upheld the settlement even though it did the same thing. And I think that could be criticized, but this case provides, in addition to that injunctive relief, also provides automatic monetary relief in the form of super likes, which are equivalent to cash because we know class members wanted them. And also the option of getting additional monetary relief and or additional super likes or Tinder paid services in exchange. So this is very distinct from Coby. The injunctive relief claim is not valueless. I don't see any error by the district court with respect to application of a case law. All the appropriate Ninth Circuit standards were satisfied. And while this court may come to a different conclusion ultimately about the fairness of the settlement, there's no doubt that Judge Walter applied the correct standards in the correct cases. So I don't think- You're over your time. So unless my colleagues have additional questions, I'm going to move to Mr. Brown. Do either of you have additional questions of Mr. Bacon? Oh, no. All right, Mr. Brown, you're up. Thank you, Your Honor. Good morning, Your Honors. Donald Brown, Manette Phelps, and Phyllis on behalf of defendants and appellees, Tinder Inc. and the Ninth Circuit. The court has already correctly noted that the claims at issue here, both in this case and in the Candelaria case for which Ms. Leonard is counsel for the convicted class, involve claims that resulted in no actual harm. There is no case anywhere, no case cited, and no case exists where a single plaintiff, let alone a class, has recovered damages for not receiving an age-related discount. There is no right to an age-related discount. And thus, the whole premise of these claims, insofar as it's- Can you respond to Ms. Leonard's law of the case on Candelaria? Sure. The Candelaria case, that appellate decision, if this case were to, if the claims were to go forward in the Candelaria case in state court, the Candelaria decision would be law of the case for that. Again, subject to possible further review by the Supreme Court in light of the clear split of authority between the Javorski case on the one hand, which we believe faithfully followed California law, and the Candelaria decision, which we think was a departure from the law. But there's a couple of problems there. Appellate's counsel grossly overstates the usefulness of the Candelaria opinion itself. Let's even assume that the Candelaria standard for liability under the Unruh Act were to apply here. What the Candelaria court held was that the rights under the Unruh Act are inherently individual. And that was a significant departure from the Javorski standard and the standard articulated by all the other California cases that had previously addressed age-related discounts. What those other cases had said, and this was distilled in the Javorski opinion, is that you examine the pricing policy itself. You look at, was the service or product- I'm missing the relevance of all this. The Candelaria case made the position of the plaintiffs in this case stronger. They may have ultimately failed if the case went to trial for the reasons you're eloquently expressing. But since we're dealing here with a pre-certification settlement, what we need to look at, among other things, is what were the relative positions of the parties. And given that case, the plaintiffs were certainly in a better position than they had been previously, yes? Well, again, not necessarily because the standard for liability under the Candelaria case makes it more difficult to achieve class certification because the linchpin of the Candelaria opinion was that the rights are inherently individual. And so, therefore, you don't examine just the pricing policy. You examine how that pricing policy affects each individual. What troubled the court in the Candelaria appellate opinion was that the generalization upon which the discount was based, that is, that subscribers over the age of 29 are likely to have more income, might not apply in every case. What that court did not hold is that, therefore, if there's one exception to that generalization, there is somewhere in the California population a subscriber over the age of 30 who earns less than someone else under the age of 30. Therefore, everyone over 30 gets $4,000 in damages. The court did not hold that. Now, in addition, the district court here identified some significant defenses and impediments to recovering under either standard, whether it be Candelaria or Javorski. And again, it's a question of whether the court abused its discretion in how it took into account these various hurdles. Why did you, again, forgive my interrupting. No worries. Why did you agree to the clear-sailing provision when that has been the subject of innumerable cases saying it is a bad, bad thing? A clear-sailing provision is only problematic in instances where the award of fees is out of proportion to what's provided to the class. Well, the point is that because the adversary system breaks down when you have a settlement in a class action context, the judge is at a great disadvantage. And then if you have one party saying, well, we're not gonna oppose this when they have no particular motive to take any position whatsoever, that is, according to many cases, a red flag of a collusive settlement. It is one thing to consider when looking to whether a settlement is collusive. But again, if the agreed-upon fees are not disproportionate to the value to the class, the existence of a clear-sailing provision in and of itself is not a basis to find that that the settlement was collusive. So here, where the assumed value of the settlement was $24 million and the fees which these settling defendants agreed not to challenge were 1.2 million, that's only 5%. Now, even if the court were to accord a lower value to the settlement, it would have to be a very low value indeed in order to create a red flag. Even if you valued the settlement at $6 million, which I think would be far less than it really is, the fees agreed to were still only 20% of the value of the settlement. So bearing that in mind, that the clear-sailing provision really was not as a practical matter a red flag here. So if I think that the district court did the analysis under two theories under the attorney's base, and I'm okay with the lodestar, but I'm not okay with the other, I find some fault there, can I still affirm? Yes. Yes, the percentage of recovery standard in and of itself is a sufficient basis. The lodestar can act as a cross-check, but there's no requirement under non-circuit law to satisfy both tests, both percentage of recovery and the lodestar. Counselor, can you? Please. Go ahead. I think both Judge Rakoff and Judge Watford had questions. So, go ahead. I defer to my younger colleague. Yeah. I just had a quick factual question. Can you answer the question that your co-counsel deferred to you on? Oh, regarding the super lights? Yes, I can. And actually, Judge Watford, you were seeing it correctly. The purchase of 34 super lights, that was only for class members who actually did purchase super lights. And we don't know what percentage of the larger group that consists of? We don't know the percentage, but bearing in mind what Mr. Bacon noted, which was that 96 million, for the year 2018, for example, the tender sold $96 million in super lights, so at a cost of $1 each, that's 96 million super lights. I think it's a safe assumption that certainly a significant number of users of the app, including users of the app who subscribe to the premium service were purchasing additional super lights. And if I may, I do want to correct one factual issue. There's been a reference to subscribers to Tinder Plus or Tinder Gold getting 150 super lights per month. That's not quite accurate. They get five per day and they expire if not used. Yeah. And my question is, what do you say to Appellant's argument that this was an inadequate settlement, among other reasons, because it did not include prior Tinder members who had been, if you accept the plaintiff's theory, overcharged just as much as current Tinder members. What possible reason was there for excluding that portion of the class? If, I'm not sure I'm understanding the question because the settlement class members included every subscriber who was ever charged. Oh, okay, I misunderstood her point then. So thank you for clarifying that. Certainly, Your Honor. Okay, we'll go back to you, Ms. Leonard, and you have two minutes. Thank you, Your Honor. And to be clear, Judge Watford, on the value of the super lights, the record evidence is entirely with respect to general customers of Tinder, which are not the same thing as the small subset that are premium customers. So the idea that they sell these for a dollar to other free, overwhelmingly free customers does not support the conclusion that a single class member would put that monetary value. But even setting that aside, Judge Rakoff, to go to the point that you were just raising, the problem with that component is it gives the former customers nothing who are within the class. They are within the class, but they no longer have an account with Tinder. They looped in 44% as of the time of the settlement of the class members did not have a Tinder account. They looped those into the settlement. They give them nothing, and they give the relief to the currents. That's a structural issue. Can they get 25 bucks if they file a claim? If they file a claim, that is correct. And we know the actual value of that component. That standing alone would not be a fair, reasonable, and adequate settlement for all of these class members. $44,000 for claims that are valuable. And that is the point I wanted to end on, which is the Candelari decision, law of the case with respect to these claims, the value of that decision is not what Mr. Brown was saying, simply a decision that leads to individualized assessments. The Court of Appeal determined that age discrimination in pricing, as pled that Tinder did here, and there's no real dispute, they used aged tiers. They didn't give a discount. They used aged tiers in pricing. That violates California law. And the California legislature has made the policy decision that that is important to stamp out. And that class certification will not be difficult, as Mr. Brown has said. It does not require individualized assessment. The court erred here fundamentally by discounting and disregarding the import of the Candelari case with respect to these class members' claims. That is reversible error. The court erred in giving $24 million in valuation. Every single component, as Mr. Bacon conceded, the injunctive relief valuation was incorrect. Every single component is based on an error. And something so central to the approval of the case as the value to the class cannot withstand review if every single component is based on an error. This deal is worth $44,000, not $24 million, and the decision must be reversed. All right, thank all of you for your arguments in this matter, and this case will be submitted. Thank you. Thank you. Thank you, Your Honor. Thank you, Your Honor. And then, let's see here. All right, and then the final case on calendar is Alicia Perez versus Lincoln National Life Insurance, case number 19-56274. That was submitted on the briefs and will be submitted as of this date. And I believe that would put this course in recess for the week. If the judges would stay on, we'll be transferred to the roving room. Thank you. This court for this session stands adjourned.
judges: Callahan, Watford, Rakoff